UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
UNITED STATES OF AMERICA,

        -against-                              **MEMORANDUM and ORDER**

AHMED ALDEEN,                                    06-cr-31 (SLT)

        Defendant.
------------------------------------------------------x

**TOWNES, United States District Judge:**

        Defendant, Ahmed Aldeen, moves pursuant to Fed. R. Crim. P. 12(b) to suppress statements which defendant made to Secret Service agents on December 6, 2005. This Court, having conducted a suppression hearing on September 6, 2006, now denies defendant's motion for the reasons set forth in the following findings of fact and conclusions of law.

Findings of Fact

        The sole witness at the suppression hearing was John Simmello, a Special Agent of the United States Secret Service. The Court credits Agent Simmello's testimony in its entirety.

        Agent Simmello is a member of the Protective Intelligence Squad, which investigates, among other things, complaints regarding the use of falsified Secret Service credentials and the impersonation of Secret Service agents (H. 4).[1] On November 26, 2005, Simmello's Squad received a complaint alleging that defendant was "engaged in computer-hacking crimes, as well as producing Secret Service credentials and posing as a Secret Service special agent" (H. 5). Later that day, Simmello spoke via telephone with Aaron Harp – the man who owned the computers allegedly used in the crimes being investigated – and obtained his permission to seize and search his computers.

---

[1]Numbers in parentheses, preceded by "H," refer to pages in the transcript of the September 6, 2006, suppression hearing.

After retrieving these computers from a residence owned, but not occupied, by Harp, Simmello and his colleagues delivered the equipment to the Secret Service's "computer-crime section" – the ESCAP Unit (H. 7). After examining the computers, ESCAP informed Simmello that it had discovered two video files containing child pornography on one of Harp's computers (hereinafter, the "black computer") (H. 8). On December 5, 2005, Simmello telephoned Harp to inform him that he could pick up some of the seized items at the Secret Service's New York Field Office and that agents wished to speak to him (H. 8). Although Simmello did not request that Harp bring anyone with him, defendant accompanied Harp to the New York Field Office the following day (H. 8-9).

Simmello, who recognized defendant from pictures he had seen in the course of his investigation, asked defendant why he had come to the office (H. 9-10). Defendant told Simmello that he "wanted to speak" to Secret Service agents, but did not indicate what he wanted to discuss (H. 10). Nonetheless, Simmello agreed to speak with defendant after he interviewed Harp.

After a private 15-minute conversation with Harp, Simmello went to the reception area and offered to speak with defendant (H. 11). Defendant then voluntarily accompanied Simmello and a colleague, Agent Brown, into an 10-by-15-foot interview room adjacent to the reception area. Although Simmello, who was not armed at the time, closed the door to the interview room, the door remained unlocked throughout the 30-minute conversation that ensued.

At the start of the conversation, the agents told defendant that he was not under arrest or in custody, did not have to answer any questions and was free to leave at any time (H. 14). Defendant said that he understood their admonitions, but nonetheless "wanted to straighten

everything out and to talk things over" (H. 14). Defendant then admitted that he had possessed the black computer, stating that Harp had given it to him "to refurbish and to use" in April 2005 (H. 14). He further admitted retaining possession of the computer until "a week or so before Thanksgiving" 2005, when he returned the computer to the apartment from which the agents had subsequently seized it (H. 14). At the agents' request, defendant readily agreed to write a statement acknowledging his possession of the computer during this six-month period (H. 15).

After defendant finished writing this statement, which was introduced into evidence at the hearing as Government Exhibit 1, the agents questioned defendant concerning the pornography ESCAP had discovered. Defendant agreed that there was "a lot of pornography" on the computer, but became visibly nervous when the agents asked him about the child pornography (H. 15-16). The agents again advised defendant that he was not under arrest or in custody, did not have to answer any questions and was free to leave at any time (H. 16). However, defendant said he wanted to continue talking (H. 16).

Defendant thereafter admitted that he had downloaded the child pornography, but claimed that he had viewed the video files only once (H. 16). The agents, aware that the video files had been accessed on more than one occasion, told defendant that they "were actually able to know that he looked at it more than once" (H. 17). Defendant ultimately admitted that he had viewed the files more than once (H. 17).

When the agents asked defendant to reduce these admissions to writing, defendant asked if he "was going to be in trouble for viewing [and] downloading the child pornography" (H. 17). The agents told defendant that "it was not up to [them]"; rather, they intended to tell the U.S. Attorney's Office about the conversation, and "it would be up to the U.S. Attorney's Office and

3

the judge to decide whether or not he would be in trouble" (H. 17). The agents then offered defendant the choice of having them paraphrase what he had said or writing his own statement (H. 17-18). Defendant elected the latter option (H. 18). However, before defendant began to write, the agents advised defendant for a third time that he was not under arrest or in custody, did not have to answer any questions and was free to leave at any time (H. 18). Defendant then wrote a second statement, introduced into evidence at the hearing as Government Exhibit 2, in which he admitted downloading and viewing the child pornography (H. 19).

After obtaining this second written statement, the agents told defendant that they had no further questions and escorted him back to the reception area, where Harp was still waiting (H. 20). Both defendant and Harp voluntarily remained in the reception area for a few more minutes while the agents returned to their office to gather the computer equipment that they wanted to return to Harp (H. 20).

Simmello conceded that, although the agents had access to *Miranda* warning forms, they did not read defendant his *Miranda* warnings at any time during the interview (H. 31). Simmello admitted that he knew, prior to the interview, that the child pornography had been downloaded sometime between April and November 2005. However, Simmello did not consider defendant to be the prime suspect just because he possessed the black computer during that period, since there remained a possibility that other people had access to the computer during that time (H. 28-29). To Simmello, defendant became the prime suspect only after he admitted downloading and viewing the child pornography (H. 21).

Conclusions of Law

*Miranda v. Arizona*, 384 U.S. 436 (1966), requires that "certain warnings must be given before a suspect's statement made during custodial interrogation [can] be admitted in evidence."

*Dickerson v. United States*, 530 U.S. 428, 431 (2000).  Defendant moves to suppress his December 6, 2005, statements solely on the ground that Agents Simmello and Brown failed to read defendant these *Miranda* warnings.  Since Simmello conceded that the agents did not read defendant these warnings, the only issue to be determined upon this motion – as defense counsel correctly noted during her post-hearing argument – is whether defendant was "in custody" at any point during the December 6, 2005, interview.

The *Miranda* Court defined "custodial interrogation" to mean "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444.  "An accused is in custody when, even in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave." *Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998) (quoting *United States v. Kirsh,* 54 F.3d 1062, 1067 (2d Cir.1995)).  However, "[t]he free-to-leave inquiry" is only "a necessary, but not determinative, first step in establishing *Miranda* custody." *United States v. Newton*, 369 F.3d 659, 670 (2d Cir.), *cert. denied*, 543 U.S. 947 (2004).  "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California,* 511 U.S. 318, 324 (1994) (internal quotation marks omitted; bracketed material in original).

In *Newton*, the Second Circuit surveyed recent Supreme Court jurisprudence in this area and established a two-step analysis for determining whether police questioning constitutes custodial interrogation.  The Second Circuit stated:

> [I]t makes sense for a court to begin any custody analysis by
> asking whether a reasonable person would have thought he was
> free to leave the police encounter at issue. If the answer is yes, the
> *Miranda* inquiry is at an end; the challenged interrogation did not
> require advice of rights. On the other hand, if a reasonable person
> would not have thought himself free to leave, additional analysis is
> required . . . . In such cases, a court must ask whether, in addition
> to not feeling free to leave, a reasonable person would have
> understood his freedom of action to have been curtailed to a degree
> associated with formal arrest. Only if the answer to this second
> question is yes was the person "'in custody' for practical
> purposes," and "entitled to the full panoply of protections
> prescribed by *Miranda*."

*Newton*, 369 F.3d at 672 (citations omitted).

Applying the *Newton* analysis to the facts in this case, this Court finds that a reasonable person would have thought he or she was free to leave at any point during the interview. First, defendant voluntarily accompanied Harp to the New York Field Office, where he himself insisted on speaking to the agents, saying he "wanted to straighten everything out" (H. 14). The agents agreed to talk with defendant but apprised him, at the very start of the interview, that he was not under arrest or in custody, did not have to answer any questions and was free to leave at any time (H. 14). When defendant appeared nervous following the first mention of child pornography, those admonitions were repeated (H. 16). The door to the interview room was not locked, and there is no evidence that the agent said or did anything to communicate that defendant was not, in fact, free to leave.

This Court does not credit defendant's assertion, contained in an affidavit he submitted in support of his suppression motion, that he "no longer felt free to leave" once the Secret Service agents informed him that they had found child pornography on the black computer. *See* Affidavit of Ahmed Aldeen, dated August 9, 2006, at ¶¶ 6-7. Rather, this Court credits

6

Simmello's testimony that, after being advised that he was free to leave for the second time, defendant said he wanted to continue talking. Moreover, regardless of defendant's subjective feelings, this Court finds that a reasonable person would have taken the agents at their word and felt free to leave.

The question of whether a reasonable person would have still felt free to leave after admitting to downloading and viewing the child pornography is closer. After all, Simmello himself conceded during his testimony at the hearing that he viewed defendant as the prime suspect following that admission (H. 21). However, before defendant began his second written statement, the agents advised defendant for a third time that he was not under arrest or in custody, did not have to answer any questions and was free to leave at any time (H. 18). The door to the interview room was still not locked and, regardless of what Simmello may have been thinking, neither he nor Agent Brown did or said anything to suggest that they did not mean what they said. To the contrary, the agents made clear that they did not intend to arrest defendant, telling him that "it would be up to the U.S. Attorney's Office and the judge to decide whether or not he would be in trouble" (H. 17).

Accordingly, this Court concludes that, even after admitting to downloading and viewing child pornography, a reasonable person would still have felt free to leave. Indeed, it is obvious to this Court that defendant chose to stay, not because he felt he could not leave, but because he wanted to restate his admissions in his own words, rather than to permit the agents to paraphrase his statements during their subsequent talks with prosecutors.

This Court's conclusion that defendant was not subjected to custodial interrogation finds considerable support in *Oregon v. Mathiason*, 429 U.S. 492 (1977) (per curiam), a case which is

7

strikingly similar to the one at bar. In *Mathiason*, the defendant, a burglary suspect, agreed to speak to a state police investigator at the state patrol office. Upon the defendant's arrival, the investigator escorted the defendant into an interview room and closed the door, but advised him that he was not under arrest. *Id.* at 493. After telling the defendant that he wanted to discuss the burglary and that his truthfulness might subsequently be considered by the prosecutor or judge, the investigator stated that he believed that the defendant was involved in the crime. The investigator further stated, falsely, that the defendant's fingerprints had been found at the crime scene. *Id.* Within five minutes, the defendant confessed. The investigator read the *Miranda* warnings and took a taped statement, but then released the defendant, saying he would refer the case to the district attorney.

On these facts, the Supreme Court held that the defendant was not subjected to custodial interrogation. The Court noted that the defendant had come voluntarily to the state patrol office, had been immediately informed he was not under arrest, and was permitted to leave without hindrance at the end of a half-hour interview. The *Mathiason* Court held that it was "clear from these facts that [the defendant] was not in custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 495 (internal quotation marks omitted).

The questioning in *Mathiason* was, if anything, conducted in a more coercive atmosphere than the interview in this case. First, the investigator in *Mathiason* suspected the defendant and asked him to come to the state patrol office. In this case, the agents did not suspect defendant of involvement with child pornography at the time defendant himself decided to go to the New York Field Office to "straighten everything out." In *Mathiason*, the investigator advised the defendant that he was not under arrest only once, then stated that he believed the defendant was

8

involved in the burglary and falsely claimed that the defendant's fingerprints had been recovered from the crime scene. In this case, the agents not only repeatedly advised defendant that he was not under arrest or in custody, did not have to answer any questions and was free to leave at any time, but also made no accusations or false allegations in the course of the interview.

Defendant, like *Mathiason*, was clearly not in custody. A reasonable person would have thought he or she was free to leave at any point during the interview. Accordingly, this Court concludes that the interview did not constitute custodial interrogation and that the agents were not required to advise defendant of his *Miranda* rights. *See Newton*, 369 F.3d at 672. Defendant's motion to suppress defendant's December 6, 2005, statements on the ground that Agents Simmello and Brown violated *Miranda* is, therefore, denied.

## **CONCLUSION**

For the reasons set forth above, defendant's motion to suppress defendant's December 6, 2005, statements is denied.

**SO ORDERED.**

/s/
SANDRA L. TOWNES
United States District Judge

Dated: Brooklyn, New York
September 11, 2006

9